UNITED STATES of America,

v.

PAN AMERICAN WORLD AIRWAYS, INC., W. R. Grace and Company, and Pan American-Grace Airways, Inc., Defendants.

United States District Court
S. D. New York.
March 8, 1961.

William P. Rogers, Atty. Gen., Edward R. Kenney, E. Riggs McConnell, Herbert F. Peters, Jr., Washington, D. C. Joseph H. Shortell, Trial Attys., Dept. of Justice, Juneau, Alaska, for plaintiff.

Cahill, Gordon, Reindel & Ohl, New York City, for defendant W. R. Grace and Co.; Lawrence McKay, William E. Hegarty, Raymond L. Falls, Jr., New York City, of counsel.

Cleary, Gottlieb, Friendly & Hamilton, New York City, for defendant Pan American World Airways, Inc.; James W. Lamberton, New York City, John K. Mallory, Jr., Washington, D. C., David W. Peck, Edward A. Woolley, New York City, of counsel.

White & Case, New York City, for defendant Pan American-Grace Airways, Inc.; Thomas Kiernan, Thomas Leary,

Lowell Wadmond, New York City, of counsel.

THOMAS F. MURPHY, District Judge.

Nominally this is a government anti-trust action brought pursuant to § 4 of the Sherman Act, 15 U.S.C.A. § 4, in which the defendants, Pan American World Airways, Inc., W. R. Grace and Company and Pan American-Grace Airways, Inc.,[1] are charged with violations of Sections 1, 2, and 3 of that act (15 U.S.C.A. §§ 1, 2 and 3.) Actually it is a continuation of a bitter family quarrel rampant since 1941 arising out of the unhappy and quondam unholy union of Pan American and Grace, each of whom owns 50% of the stock of Panagra, that the Civil Aeronautics Board (C.A.B.) could not resolve.[2]

Briefly, the complaint charges defendants with unlawful combination and conspiracy to restrain and monopolize trade and commerce between the United States and South America, particularly the west coast of South America. The relief sought is a decree requiring Pan American and Grace to divest themselves of their ownership of Panagra and enjoining all defendants from any and all challenged activities that are found to be violative of the antitrust laws. The ultimate objective of the government is to facilitate the merger of defendant Panagra with Braniff International Airways (Braniff), the only other American flag carrier operating between the United States and South America aside from Pan American and Panagra.[3] This is in accordance with the recommendation of the C.A.B. in 1954 in order to make possible thereby "effective" competition between American carriers in that area and to reduce substantially the heavy burden of subsidy presently borne by this government. New York-Balboa

Through Service, Reopened, 18 C.A.B. 501, 505.

The principal defenses urged are condonation by the government of the acts complained of, estoppel and laches; immunity because many of the agreements and mergers and acts complained of were approved by the Civil Aeronautics Board under a grant from Congress that absolved the defendants from antitrust violations and, as far as Pan American is concerned, that this court has no jurisdiction at this time because of the primary jurisdiction conferred by Congress in the Civil Aeronautics Board.

The Parties

Pan American is a corporation organized in 1927 under the laws of the State of New York as Pan American Airways, Inc. In 1950 its corporate name was changed to Pan American World Airways Inc. Pan American directly operates routes in air transportation of persons, property and mail between the United States and various points in Europe, Asia, Africa, Australia and Central and South America. It is today the largest international air carrier in the world. It also has a number of subsidiaries, including foreign corporations engaged in the transportation by air of persons, property and mail.

Grace is a corporation organized in 1899 under the laws of the State of Connecticut with its principal office in New York City. Grace has subsidiaries which engage in various aspects of industry, trade and commerce including Grace Line, Inc., which operates a steamship route, among others, for the transportation of persons, property and mail between the United States and the west coast of South America.

Panagra is a corporation organized in 1929 under the laws of the State of Delaware. Panagra is engaged in air

1. Hereinafter referred to as Pan American, Grace and Panagra, respectively.

2. The C.A.B. in 1945 and again in 1953 requested the Attorney General to institute this suit.

3. We disregard Delta Airlines, Inc., whose operations to Venezuela subsequent to 1946 are not significant to the problems of this case. Braniff was certificated for South America in 1946 and commenced such operations in 1948.

transportation of persons, property and mail over routes between the Canal Zone and Buenos Aires, Argentina, via the countries on the west coast of South America. It is wholly owned by defendants Pan American and Grace, each of whom owns 50% of the stock thereof. The principal offices of Pan American and Panagra are located in New York City.

### Civil Aeronautics Board

Commercial aviation in this country is a highly regulated industry, but became such only after Congress passed the Civil Aeronautics Act of 1938 (C. A.A.).[4] That act authorized the creation of the Civil Aeronautics Board and established for the first time a comprehensive system of economic regulation of air transportation and removed, or attempted to remove, the threat of uneconomic and destructive competition in that field by providing that no air carrier may engage in air transportation without first receiving a certificate of public convenience and necessity. It gave to the President of the United States approval and veto power for such certificates as related to "overseas" and "foreign" air transportation (49 U.S.C.A. § 601). Since, however, a number of air carriers were in operation prior to the act it provided that as to those they could receive certificates of public convenience and necessity, under the so-called "grandfather" clause (49 U.S.C.A. § 481(e)). Accordingly, Pan American and Panagra received certificates of convenience and necessity for the operations which had been conducted by them under the various foreign mail contracts.

Congress also provided what policy the C.A.B. should follow as being in the public interest and in accordance with the public convenience and necessity, and defined that policy as follows:

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

"(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense; * * * " (49 U.S.C.A. § 402).

Congress also gave to the C.A.B. the power to approve or disapprove rates and tariffs, all types of mergers, consolidations, acquisitions, pooling and other agreements (49 U.S.C.A. § 481 et seq.) and with reference to certain of its orders antitrust immunity (49 U.S.C.A. § 494).

### The Complaint

The government's case was fashioned along three major lines which, however, are interdependent both theoretically and evidencewise.

The first line deals with alleged restraints of trade relating to a division of markets in the transportation of passengers, cargo and mail in commerce between the United States and South America asserted to be illegal both from the

---

4. This Act, 52 Stat. 977, as amended, 49 U.S.C.A. § 401 et seq., was superseded by the Federal Aviation Act of 1958, 49 U.S.C.A. § 1301 et seq., and as far as relevant to this case the provisions are identical and reference will be made only to the Civil Aeronautics Act.

standpoint of reasonableness and as a *per se* violation of law. It is the government's claim that Pan American and Grace entered into an agreement prior to the formation of Panagra whereunder the proposed jointly owned company was to have the exclusive right to traffic along the west coast of South America from the Canal Zone south free from Pan American competition, and Pan American was to be free from competition from the proposed jointly owned company elsewhere throughout South America and between the Canal Zone and the United States.

The second line of attack relates to alleged restraints imposed upon Panagra by its two parent companies, Pan American and Grace. To a large extent the evidence of restraints on Panagra in the categories of joint offices, communications, equipment, publicity and sales are matters of agreement that must be initially approved by the C.A.B. and to a large degree have been approved and others are awaiting approval or extension of approval previously granted.

These agreements are, however, interrelated to the third line of attack wherein the government alleges that Pan American and Grace conspired to monopolize transportation between the eastern coastal areas of the United States and South America, particularly the western coastal areas of South America and Buenos Aires, Argentina. It is alleged that Pan American and Grace agreed to combine in the formation of Panagra, equally controlled by them to engage in a limited operation from the Canal Zone south along the west coast of South America with the intent and purpose of preventing competition between Pan American and Grace with respect to transportation by air and preventing the establishment of an air transportation service independent of the control of themselves which would be competitive with the projected air services of Pan American and the surface operation of Grace Line, Inc.

It is claimed that these defendants, pursuant to such alleged conspiracy, organized Panagra in such a fashion that they each have a negative control of the latter's competition with their independent operations, and have prevented Panagra's extension of its routes in South America and to the United States, and from developing its own facilities in the United States independent of the control of Pan American, and in South America independent of the control of Grace. In addition, they are said to have acquired the stock or assets of, or have entered into agreements with competing airlines in pursuance of their design to restrain and monopolize, and have retarded, restrained or eliminated competition from local airlines in South America, as well as having attempted and committed illegal restraints with respect to the operations of Braniff.

Grace, in addition, is charged with monopolizing or attempting to monopolize transportation by air and surface carriers between the United States and the western coastal areas of South America. The government also argues that the ownership and control of a competing air carrier by the dominant surface carrier in the same market necessarily violates the antitrust laws.

As to Panagra the government claims that it, together with Pan American, after 1946 engaged in restrictive practices to restrain and·impede other airlines on the west coast of South America.

### Conclusions

On the facts hereinafter found we have concluded (1) that the joinder of Grace and Pan American was not the result of conspiracy, but was a lawful combination with legitimate ends; (2) the division of territories understanding under which the operations of the two airlines were conducted was not unreasonable under the circumstances and not a *per se* violation; (3) that Pan American's restraints against Panagra and its continued determination to suppress the extension of that airline to the United States, in itself, and in combination with other conduct on the part of Pan American constitutes a monopolization of commerce

that contravenes the provisions of the Sherman Act, and would seem to require divestiture by that defendant; (4) that Grace's stock ownership in Panagra does not *per se* violate the Sherman Act; (5) Grace and Panagra have not been found guilty of any antitrust violations; (6) price fixing for the most part is a mooted issue and in view of our decision with regard to Pan American need not be considered at length; (7) we will defer to the primary jurisdiction of the C.A.B. the legality of the joint advertising, sales and offices, etc. agreements between the two airlines; (8) we will defer to the primary jurisdiction of the C.A.B. the question of Grace's control in the management of Panagra.

### The Facts

In 1927 substantially all transportation between this country and Latin America was by steamship. International commercial aviation was in the experimental stage and as yet no American air transportation company had entered upon operations from the United States to South America.

In October, 1927, Pan American began operations under the first United States Post Office contract for the carriage of the mails by air to a foreign country, by inaugurating such a service between Key West, Florida, and Havana, Cuba. Pan American also had a contract with the Cuban government for the carriage of Cuban mail to this country.

Between 1920 and 1927 several German and French companies had established commercial air transportation services in South America, in Colombia, Bolivia, Brazil, Argentina and Chile, and were receiving financial and diplomatic assistance from their governments necessary to the establishment and maintenance of such services. These foreign companies had envisioned routes throughout South America and had sought also to extend into the Canal Zone and to the United States.

Our government was greatly concerned for political, military and business reasons with the successful establishment of an American system of air transportation to Latin America, and recognized the need for legislation under which financial aid could be rendered to American companies to engage in international air transportation. The result was the enactment by Congress in March, 1928, of the first Foreign Air Mail Act (45 Stat. 248, amended, March 2, 1929, 45 Stat. 1449) which authorized the Postmaster General to let contracts for not more than ten years for the transportation of mail by airplane to foreign countries or insular possessions of the United States. The method of payment established by the Postmaster General was based on the mileage flown without relation to the amount of mail carried. It was in essence, subsidy.

On May 8, 1928, Pan American was awarded a contract under that act which superseded its 1927 contract for service between Florida and Cuba.

Pan American had started some time in late 1927 to formulate plans looking to the establishment of a complete system of air transportation serving all parts of the Caribbean, and Central and South America. It was aware of the potentialities of the Latin American market, as yet untapped by American international companies, and equally aware of the impending legislation to subsidize American air lines. With knowledge of the projected routes of the Post Office Department (see House Report 481, 70th Cong., 1st Sess., 1928) or better, the active sponsor of them, it began studies in early 1928 of proposed routes from Miami, Florida, to the Canal Zone, and the Canal Zone to Valparaiso, Chile.

Pan American's ambitions, however, were not equalled by its assets[5] or financial resources, and ultimately, in June 1928, all of its stock was acquired by a holding company formed for the purpose of raising capital to enable Pan

---

5. It owned three airplanes—two Fokkers and one Fairchild.

American to bid on the mail contracts advertised or about to be advertised by the Postmaster General, and to conduct operations under contracts it was awarded. This company was called the Aviation Corporation of the Americas (ACA) and included among its assets acquired at the time of the acquisition of Pan American, was an option to operate a concession by the government of Peru for the establishment of an air transportation service between the United States and Peru. In June 1928 ACA acquired a contract for the carriage of Peruvian air mail to the United States. The concession and mail contract were intended ultimately to be assigned to Pan American if and when it began a west coast service contemplated in its plans.

On July 13, 1928, Pan American was awarded the United States mail contract for the route from Miami to the Canal Zone, for ten years, with an option in the Postmaster General to extend the route along the north coast of South America via Trinidad, as far as Paramaribo, Dutch Guiana. On the same day Pan American was awarded a 10-year contract for a route from Miami to Puerto Rico, with a similar option for the extension of this route to Trinidad.

In order to engage in air transportation operations into or within any of the countries of South America at this time, as well as today, such operating rights must be granted by the government of each such country whether by permit or concession. Without such rights Pan American or any foreign company could not even fly over these countries.[6] By the end of July 1928, Pan American had instituted negotiations for operating rights in Panama, Colombia and Ecuador. By reason of the option in Peru it was assured of rights in that country (or it could subcontract that portion of its proposed west coast operations to a Peruvian subsidiary). If it could secure rights in the first mentioned countries and in Chile the way would then be clear for the proposed operations under a contract to be advertised by the Postmaster General from the Canal Zone to Valparaiso, Chile. In Colombia, however, Pan American's efforts to acquire operating rights were opposed by German interests who controlled SCADTA, a Colombian air line organized in 1920 and operating in that country and between Colombia and Ecuador. The owners of SCADTA were influential with the Colombian government. They had sought to extend their line to the Canal Zone and thence to this country since 1925 or 1926 but without success. Being thus situated, they had successfully opposed Pan American's applications for Colombian rights and thereby blocked the extension of American flag operations south of the Canal Zone.

As early as 1927, Pan American sought to purchase all of the stock of SCADTA, and these negotiations continued until January 1929, at which time the principal stockholder and managing director of the company orally agreed with Pan American to sell sufficient stock to enable Pan American to gain control of the company. The agreement to purchase SCADTA stock immediately opened the way for the establishment of an American flag west coast airline, for as part of the agreement, SCADTA withdraw all opposition to Pan American's application to the Colombian government, and entered into an agreement granting to Pan American exclusive use of its landing facilities along the north and west coasts of Colombia and in Ecuador, subject to its receiving permits from the Colombian government. In February, 1929, a treaty was signed between the United States and Colombia providing for reciprocal rights to aircraft of the two countries for landing rights in the Canal Zone and Colombia. The oral agreement for the purchase and sale of SCADTA stock was reduced to a formal writing in February, 1930, and finally executed in April of 1931.

In early 1928 Grace had independently begun to inquire into the possibilities of

---

6. Cf. Northeast Airlines, Inc.—North Atlantic Route Case, 6 C.A.B. 319, 322.

a west coast airline and had caused a study to be made with respect thereto. It began inquiries with governmental officials and in time became apprised of the activities of the Pan American interests and their plans for a west coast route. Pan American at this time was seeking to interest the principal shipping companies along the various proposed routes in financial participation as well as to secure the benefits of association with steamship lines, including air-sea rescue arrangements, and use of communication and agency facilities of these lines which would considerably decrease the amount of capital investment for such facilities immediately necessary in the operation of air transportation companies.

In May 1928, officials of Grace and Pan American conferred with a view to joint participation, and again in the following

months. Grace's approach was a conservative one at the outset. It was naturally interested in the new form of transportation and fully appreciated the commercial possibilities of the airplane. It also appreciated the potentially competitive aspects of air transportation, but felt that it was quite risky at that early stage and no immediate threat as a competitor of its steamship lines.

At this time Grace was aware of the impending contracts to be offered by the Post Office, including the Miami-Canal Zone route which eventually went to Pan American, but its interest was limited to the proposed Canal Zone-Valparaiso route.

In the fall of 1928 Pan American entered into an agreement with Grace, evidenced by two letters dated respectively August 31st and September 7th,[7]

---

7. "August 31, 1928.
   "Aviation Corporation of
      the Americas,
   "100 East 42nd Street,
   "New York City
         "Attention: Mr. J. T. Trippe
   "Dear Sirs:
   "This will confirm arrangement under which we will associate for the commencement of an airplane service in Peru with the view of ultimately inaugurating a through mail service from the Panama Canal to Valparaiso, Chile.
   "A corporation will be formed under the laws of Delaware with a capital stock of $50,000, of which $25,000 will be subscribed by yourselves and $25,000 by ourselves. This corporation will pay to Huff-Daland Dusters, Inc. the sum of $15,000 for an assignment which will convey all of the rights of that company under its present Peruvian mail contract and concession. As soon as possible after the assignment has been completed, operations will be started by this company in Peru and every effort will be made to put the business there on a paying basis.
   "We will in the meantime cooperate with you in studying the costs of operation on the route from the Panama Canal to Valparaiso and also the advisability of requesting the U. S. Post Office Department to advertise for a mail contract on such route and the terms of such advertisement.
   "If you determine that it is advisable

to bid on a contract for carrying the mails between the Panama Canal and Valparaiso, the Delaware corporation above referred to will be used in such service either by an increase in its capital stock to an amount sufficient to operate on the whole route or as a subsidiary operating in Peru. In either event our subscriptions to the stock of the Delaware Company shall be credited at their full amount in the capital setup of the corporation operating the through service. We shall also have a reasonable time after a study of the estimated costs of such operation to determine what interest, if any, we will take in the company making the bid in addition to our initial investment of $25,000, such interest not to exceed, however, more than fifty percent of the total capitalization.
   "You will have charge of the operation of the service from the Canal to Valparaiso and our houses on the West Coast of South America will be the agents of the company on a reasonable compensation basis, such agency to continue during the life of transportation contracts undertaken by the company.
   "The details of carrying out the above must, of course, be worked out as we go along. We believe, however, that we have stated broadly the basis of our understanding.
            "Very truly yours,
               "W. R. Grace & Co.
                  "William F. Cogswell,
                  "Assistant Secretary."

whereunder each agreed to subscribe equal amounts to the capital stock of a corporation to be formed under the laws of Delaware to operate an airplane service in Peru with the view to ultimately inaugurating a through mail service from the Panama Canal to Valparaiso, Chile. The agreement provided that the two companies would cooperate in studying the costs of operations on such route and that if Pan American determined that it was advisable to bid on a contract for carrying the mails between the Panama Canal and Valparaiso, the amount contributed by Grace to the stock of the company which was to operate in Peru should be treated as a contribution to the stock of the company making the bid and Grace was to have an option to take an additional interest in such a company not to exceed 50% of the total capitalization. Pan American was to "have charge of the operations of the service from the Canal to Valparaiso" and the Grace houses on the west coast of South America were to act as agents for the company.

Pan American's study of this route indicated that even with the revenue of a United States mail contract, conditions did not then justify its undertaking to install an air transportation service in that area. By combining with Grace, however, they mutually concluded that they could operate a west coast service more economically than could any other air transportation company, including the French and German companies.

The Delaware company referred to in the letters was formed under the name "Peruvian Airways Corporation" and it began operations in Peru in September, 1928, under the Peruvian concession and contract referred to above. In January, 1929, Grace and Pan American secured operating rights in Chile and, as stated earlier, Pan American's negotiations with SCADTA had set the stage for a concession from Colombia. On January 31, 1929, the Post Office Department issued an advertisement for a contract for Foreign Air Mail Route No. 9, from the Canal Zone down the west coast of South America to Santiago, Chile, with an option in the Postmaster General to extend the service from Santiago across the Andes to Buenos Aires, Argentina, and Montevideo, Uruguay.

Panagra was formed on January 25, 1929, as South American Airways Corporation and changed to Pan American-Grace Airways, Inc., on February 21, 1929. Grace exercised its option to acquire 50% of the stock, and Panagra submitted a bid for the mail contract. Pan American and Grace each subscribed $500,000 to the capital stock of Panagra, including the amounts previously subscribed by them to the stock of Peruvian Airways Corporation.

On March 2, 1929, the Postmaster General awarded to Panagra the contract for

"September 7, 1928.
"W. R. Grace & Company,
"10 Hanover Square,
"New York City
    "Attention: Mr. William F. Cogswell.
"Dear Sirs:
    "We beg to confirm the arrangement set forth in your letter of August 31st.
    "Supplementing paragraph four, however, we would point out the fact that in the event you decide not to take up a substantial interest in a jointly owned Company, organized or to be organized for the purpose of submitting a bid on the contract for carrying mails between Panama Canal and Valparaiso then, and in that event, we would prefer to bid on the contract through the medium of Pan American Airways, Inc., or some other wholly owned subsidiary.

"If this were done, we would arrange to allow you, if you desired, to take a further stock interest in Aviation Corporation of the Americas, in addition to the $25,000 referred to in paragraph five.
    "Our Directors are delighted that we are to be associated with your firm in the development of air transportation on the West Coast of South America, and we look forward to a most pleasant and profitable relationship.
    "We would appreciate your advising us if this letter, in connection with yours of August 31st, covers your understanding of our arrangement.
                "Yours very truly,
                "Aviation Corporation of
                    The Americas
            "By      J. T. Trippe,
                "Vice President."

Foreign Air Mail Route No. 9. Panagra was not the lowest bidder for this contract[8] but was found by the Postmaster to be the lowest responsible bidder that could satisfactorily perform the service to the best advantage of the government. In making the award, the Postmaster stated, *inter alia:*

"This is the most important air mail contract that has as yet been awarded. Its importance goes not alone to the financial ability of the bidders but more directly and to a far greater degree to their proven and recognized capacity for performing the service contemplated.

"The Pan American company has filed evidence of extensive preparation for the operation of an air mail route through the countries with which arrangements are necessary. It has had this particular service in view for the last two years and has for that length of time been conducting negotiations and perfecting arrangements for the carrying on of the service if in the fulness of time it should be awarded the contract for it. It has the required franchises under which to operate in the countries to be served and over which the line passes. It is indeed operating through subsidiary companies already in existence over a considerable portion of the route under consideration. In addition to this it will have the benefit of all the facilities of the Grace Line of steamers now operating a firmly established service by sea along the whole line of the proposed air mail route.

   \*    \*    \*    \*    \*    \*

"I would repeat that the contract in question is for a route most difficult to serve but at the same time of very great and far-reaching impor-

tance not only to the public but to the whole future of transportation by air. Failure would be a serious blow to the prestige of American aeronautical enterprise."

Panagra commenced operations under this contract on July 12, 1929, and later, on October 12, 1929, inaugurated operations from Santiago to Buenos Aires after the route was ordered extended by the Postmaster General in August, 1929.

Until November of 1929 operations on Panagra's routes as far south as Guayaquil, Ecuador, were conducted by aircraft and personnel of Pan American because Panagra had not until that time secured operating rights in Colombia in its own name. By the end of 1929, Pan American's routes having been extended by the Postmaster General, it was operating regular service along the north coast of South America to Paramaribo, Dutch Guiana.

The joinder of Pan American and Grace, with their complementary resources, in the formation of Panagra to establish American air transportation on the west coast of South America was of decisive importance to the Postmaster General in awarding to Panagra the United States Mail contract for the west coast route. Such a contract was the umbilical cord of any proposed American flag international air operations in South America, without which they could not long survive. It is beyond peradventure that the successful inauguration of an international air transportation system in South America, with the flying equipment then available, with no airfields or ground facilities but what defendants supplied or arranged themselves, with only the air to fly in and the ground to land on, was in the truest sense a pioneering endeavor.[9] The technical and physical resources possessed by each of the defendants, together with the financial and

---

8. The award of this contract was protested by the low bidder (American International Airways, Inc.), which protest was denied after the Attorney General rendered an opinion sustaining the legality of the award. See 36 Ops.Atty.Gen. 33.

9. See a newspaper account of 10-day inaugural flight, Buenos Aires to Miami, Chicago Daily News, October 18th–November 1, 1929. See, too, Latin American Air Service Case, 6 C.A.B. 857, 865.

diplomatic assistance rendered by this government, were pooled to facilitate the success of Panagra, the American entry on the west coast of South America.

In September, 1930, Pan American acquired the assets of New York, Rio & Buenos Aires Line, Inc. (NYRBA), an American company which had been formed in March, 1929, by persons independent of Pan American and Grace with the purpose of operating an airline service under mail contracts obtained in South America, from Miami through the Caribbean, and down the north and east coasts of South America to Buenos Aires, and across the Andes to Santiago, Chile.

The key to the successful maintenance of an American airline in Latin America was a United States Post Office mail contract, without which a company could operate only at a heavy loss. The joint company (Peruvian Airways) which preceded Panagra operated at a loss on the west coast prior to the awarding of the contract to Panagra for that route. Pan American had instituted competitive services on the east coast with NYRBA prior to September, 1930, without the benefit of a United States mail contract for that route and it too, as well as NYRBA, sustained heavy losses amounting to about $40,000 a month. It nevertheless so operated in order to put itself in position to compete with NYRBA in bidding for a proposed United States mail contract for the east coast route. NYRBA had two wholly owned subsidiaries, Trimotor Safety Airways, Inc. and NYRBA do Brasil, and together they had secured contracts from the governments of Argentina, Brazil, Uruguay, Chile and Venezuela, for the carriage of mail from those countries north to the United States. These contracts were at considerably lower rates of pay than those awarded by our Post Office Department, and because of the scheme of its contracts, it created a problem for the Post Office Department with possible embarrassment with countries on the west coast of South America who contracted with Panagra. The situation also created a problem with respect to the award of

a satisfactory mail contract if there was to be competitive bidding between NYRBA and Pan American. The Postmaster General determined not to advertise for an airmail route down the east coast of South America from Paramaribo unless some satisfactory arrangement could be made between Pan American and NYRBA, and apparently suggested that the two companies merge. Pan American was concerned about possible antitrust implications in the proposed merger and sought advice and "clearance" from the Department of Justice.

In a memorandum to that department dated July 18, 1930, Pan American set forth the details of the proposed acquisition of all of the assets of NYRBA, the competitive situation between the two companies, as well as with respect to foreign airlines in the area, and also as regards competition from steamships along the proposed route. Pan American demonstrated the economic impossibility of continued competition between itself and NYRBA on the same route without an air mail contract from the United States Post Office, and that it was the policy of the Post Office Department not to subsidize two contractors in South America for the same route. Pan American pointed to the diplomatic and financial assistance given to its foreign competitors by the French, English and German governments, and that effective similar assistance from the State Department could be rendered to only one American operator in the same area. In this memorandum Pan American disclosed its interest in Panagra, indicating that Panagra was part of the Pan American system, and also that the assets of NYRBA included NYRBA's wholly owned subsidiaries.

Pan American made a persuasive argument to indicate that the acquisition would be of substantial benefit to the public, and was of particular interest to the Post Office Department, the Department of Commerce, and to the State, War and Navy Departments as well. On August 1, 1930, the Department of Justice responded, *inter alia,* as follows: "Upon

the basis of the information thus furnished the Department does not at the present time deem that any action by it would be warranted if the proposed acquisition should be effected. This, however, cannot under the law limit the full freedom of the Department to take such later action as future developments, further information or a subsequent consideration of the questions involved may in its judgment warrant."

Pan American made no mention of its earlier agreements, first oral and then written, with regard to its purchase of control of SCADTA, the acquisition of 84% of whose stock was thereafter completed in April, 1931. It claims that both the oral and written agreements were required by the seller to be kept strictly confidential until the sale was completed, and that Pan American adhered to that condition, disclosing it, one of its officers testified many years later, only to the Secretary of State on a personal and confidential basis. What effect disclosure of its impending acquisition of SCADTA may have had on Pan American's application for "clearance" from the Department of Justice we can only speculate.

As we said above, Pan American did acquire the assets of NYRBA in September, 1930, together with the stock of NYRBA do Brasil as contemplated in its memorandum to the Department of Justice, and in October, 1930, the name of that subsidiary was changed to Panair do Brasil. (In 1935, Pan American secured its own operating concession from Brazil and then reduced its stock in Panair do Brasil to 58%, and again in 1947 to 48%. In 1940 SCADTA merged with another Colombian airline and the name was changed to AVIANCA. Pan American received 64% of the stock of AVIANCA, which was reduced in 1945 to 48% and as of 1954 it owned 38% of AVIANCA. The 1940 merger was precipitated by the Colombian government which passed a law in that year requiring the majority of SCADTA stock to be owned by Colombian Nationals. How it disposed of its stock and to whom, and what the relationship was or is, was not disclosed by the evidence.)

On September 24, 1930, the Postmaster General awarded to Pan American a contract for a route from Paramaribo down the east coast of Santos, Brazil, with an option to extend the route to Buenos Aires. Pan American inaugurated service to Buenos Aires under this contract in 1931.

This last extension of Pan American's east coast route rounded out the United States air mail service throughout South America. The entire northern and eastern part, and the northern portion of the western part from Miami to the Canal Zone were operated by Pan American, and the southern portion of the western part from the Canal down the west coast and across the Andes operated by Panagra.

In August, 1931, Pan American organized UMCA, a Delaware corporation, to which was assigned a concession theretofore granted by the Colombian government to one of its nationals for a route between Medellin, Colombia, and Panama. The concession required as a condition that the proposed airline become associated with an American company to be approved by the Colombian government. The assignment to UMCA, in which Pan American acquired a 75% voting interest, was approved by the Colombian government and UMCA commenced operations in July, 1932. (In 1947 Pan American acquired all of the stock, which it retains to this day. In 1948 Pan American sought approval from the C.A.B. of its proposal to acquire all of the assets of UMCA and, though the hearing examiner recommended it, the C.A.B. has never acted on the recommendation. In 1959 UMCA applied for leave of the C.A.B. to abandon its certificated operations.)

Pan American and Panagra merely had landing rights in Colombia along their international routes at this time. The acquisition of UMCA enabled Pan American to carry traffic into Colombia, which was one of the reasons for its ac-

quisition and, additionally, Pan American considered this route as a link in a possible short-cut route across South America to Buenos Aires and Rio de Janeiro. SCADTA had a monopoly in the carriage of Colombian mail and a virtual monopoly for all intra-Colombian traffic, partly because of the air policy of the Colombian government and partly because of a tripartite agreement among Pan American, Panagra and SCADTA, whereunder SCADTA withdrew from operations into Ecuador in competition with Panagra and withdrew its opposition to the efforts of Pan American and Panagra to acquire landing rights in Colombia. In return Pan American and Panagra agreed not to press for rights to operate within Colombia.

In 1934 Panagra formed a Peruvian company, Aerovias Peruanas, in order to protect its position in that country. At the same time the original joint company, Peruvian Airways, was dissolved. After about four years of very strong competition between Panagra, and its Peruvian subsidiary on the one hand, and Faucett Aviation Company, the leading Peruvian company, on the other hand, with both sides sustaining heavy losses, Panagra and Faucett reached an agreement whereby Panagra's subsidiary withdrew from all operations in Peru, and Panagra acquired 20% of the stock of Faucett. Panagra's local service in Peru was to be limited to that incident to its international itinerary and its tariffs for such local service was to be based upon its international rates, which would effectively maintain a differential between its fares and those charged by Faucett. Faucett was thereafter to confine its activities to local service within Peru and to refrain from entering into any connection with any international company without the consent of Panagra.

In 1944 Panagra submitted this agreement to the C.A.B. for its approval. In 1949 the C.A.B. disapproved the above provisions which were accordingly cancelled by Panagra and Faucett. Today Panagra's stock ownership in Faucett amounts to about 19%. A law passed by the Peruvian government in 1949 effected a suspension of Panagra's rights to carry local traffic (cabotage) along its international route. Panagra re-established their local services in Peru within their international lines in 1952, after agreeing with Faucett, in consideration of the latter's not opposing such re-establishment, to calculate its rates for such local service on the basis of its international rates, and not to advertise within Peru, such local services.

At the instigation of the State Department and in cooperation with other federal agencies, Panagra in 1941 acquired a stock interest in a Bolivian airline, Lloyd Aeros Bolivianos (LAB) and entered into a management agreement to manage that line. This acquisition was pursuant to this country's de-Germanization program with respect to South American airlines. Panagra's stock interest in this company amounts to about 21% today.[10]

The prime objective of the defendant airlines in the first decade of operations was to secure and solidify the position of their main international trunk lines throughout the countries in South America through which they ran. They considered the maintenance of local subsidiaries essential to that end and the bulwark of their international links. Through these lines they sought to obtain the good will of the nationals of these countries and the cooperation of local governments. They also served as feeder lines for their through routes and as the instrumentalities through which they could secure from the local governments the rights to carry local traffic along the points of the international lines. These subsidiaries served also as a wedge whereby defendants could successfully oppose the efforts of local national companies that sought to secure monopolies within their own countries. It was a

10. To complete the picture, Pan American also owns today, some 30% of the stock of a Venezuelan airline, AVENSA.

costly and losing proposition, however, to maintain these subsidiaries. It was more economical and ultimately more advantageous to acquire a stock interest in an influential national company.

### Conclusions Re Conspiracy

The acquisitions, alleged predatory practices,[11] division of territories [12] and agreements with competitors have long been known to this government, and there is no dispute as to the facts and surrounding circumstances. The dispute relates to the inferences which we are asked to draw from the evidence. The argument for the inference of conspiracy is appealing to a mind bent on finding conspiracy.

From the outset, both Grace and Pan American had to fully appreciate the dangers of competition between themselves for the air mail contract about to be advertised for the west coast route. Neither of them might get it, or one could succeed but probably at a prohibitively low bid. They also must have realized that conflicts would arise in their partnership.

Grace was aware of the competitive potential of air transportation with its large steamship investments. So was Pan American aware of potential competition, but its ambitions were far more extensive than Grace's in air transportation at that time. Pan American sought to extend its system throughout Latin America. It could not do so without all of the mail contracts to be awarded. Grace's interest was confined to the west coast of South America where it was strongly established, and that was the only area where it faced competition from an airline. The award of a Post Office contract for each sector of South America, in effect, assured the American contractor of a monopoly in that sector insofar as American flag operations were concerned, and the invaluable assistance of the State Department and Post Office Department in the carrier's relations with the countries along its route.

By joining with each other in a joint venture on the west coast, Grace on the one hand would be assured against the entry of an independent American airline competitor into its west coast domain, and gain time to acquire the experience and know-how of this new industry, and one day perhaps to succeed to complete domination of the joint company. Pan American on the other hand would be substantially free from American flag competition in the rest of Latin America. Their method of organization of the joint company appears calculated to give each negative control of the company to insure against the possible treachery of the other to expand the operations of the company in competition with their respective independent lines, and their divisions of operational and agency functions of Panagra was similar added protection.

Each of these two defendants occupied a strong bargaining position. They needed the attributes of each other in the operation of an airline on the west coast, and they feared the consequences of each other's opposition. Together they were an irresistible combination bidder to the Post Office Department. Their combined interests on the west coast could insure the greatest possibilities for the success of an American carrier in that area, and at the same time protect their independent systems from the competition of such carrier. An agreement to divide the territory of operations between the two air carriers is consistent with such a design, and it is equally consistent for Grace to have agreed not to seek to extend their joint company to the United States in competition with Pan American.

The conspiracy theory is appealing, because if it were found to be the fact a court of equity would not hesitate to order both defendants to divest themselves of their interest in Panagra, and to thereby definitively rectify an unhealthy situation that exists in the South American phase of American aviation,

11. See discussion infra, page 52 et seq.

12. See discussion infra, page 33 et seq.

attributable to Pan American and Grace's joint ownership. Pan American-Matson-Inter-Island Contract, 3 C.A.B. 540, 548; Panagra Terminal Investigation, 4 C.A.B. 670, 678; Latin American Air Service Case, supra, at 914. See, too, discussion infra, page 41 et seq. re C.A.B. litigation.

■ We have carefully considered all of the evidence relating to the conspiracy charge and, in our opinion, no such conspiracy existed between Grace and Pan American. The only agreement we can find that approaches conspiracy is their understanding that Pan American and Panagra were not to parallel each other's routes. In our opinion this was not a conspiracy to monopolize and restrain trade and commerce.

The defendants' dominant position in South America which they enjoy today, and have over the years, may be explained in simple terms without unlawful implications: Pan American and Panagra got there first as American flag carriers (discounting NYRBA) by virtue of the foreign airmail contracts of the first decade and, since under the aegis and control of the C.A.B. and the President with respect to the certification of additional carriers since 1938, have enjoyed the South American market, so far as American flag carriers are concerned, exclusively until the start of operations by Braniff in 1948.

For approximately 20 years these two defendants were the sole American entries in South America and as such had exclusive claim to such aid that could be expected from this government in solidifying their position to the advantage of this country. They built up their services and good will correspondingly. And if it were not for the action of Pan American in suppressing Panagra's extension to the United States, they would in all probability remain the only two American carriers in South America. At the time of Braniff's certification, at the end of World War II there was expected a significant increase in traffic sufficient to support a third carrier in the South American market. That traffic has not materialized. Moreover, foreign competition has increased. Cf. New York-Balboa Through Service, Reopened, supra (concurring opinion).

Prior to 1938 there was no legislation regulating commercial aviation. The C.A.A. makes express provision for the approval by the C.A.B. of mergers, acquisitions and all manner of agreements between air carriers with antitrust immunity. 49 U.S.C.A. §§ 488, 492, 494. The absence of such legislation in the experimental stage of international aviation did not obviate the necessity for such action in that period by carriers within the framework of the antitrust laws. The experience gained between 1928 and 1938 must have emphasized the need therefor. Defendants' acquisitions and agreements among themselves and with foreign airlines may well have been approved by the C.A.B. were it then in existence. We find substantial reasons and circumstances then extant that might have justified such approval. Under the circumstances, we feel constrained to accept those consistent with innocence from among the equivocal inferences permissible from the evidence presented.

The joinder of Grace and Pan American of their complementary facilities was a natural and mutually advantageous combination, and an economically sound arrangement for the establishment and successful development of American commercial aviation on the west coast of South America. Grace had the established branches and agencies on the west coast and all the facilities used in connection with the operations of the steamship line that could be used to such advantage in connection with the new airline operation. Grace also had widespread commercial contacts, a respected trade name and considerable influence in the countries along the proposed route. Pan American was further advanced than any other American company in the carriage of foreign air mail, and had the technical aviation skill which Grace lacked at that time. The union of their physical and technical resources assured

the maximum possibilities of success in instituting and carrying on a pioneering venture, useful to the community which did not theretofore exist. United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 280, 46 L.R.A. 122, modified and affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136.

Grace's principal interest at the time was in transportation. Its interest in a new technique of transportation which to a large degree was most surely to generate its own traffic is readily understandable quite apart from consideration of the threat of competition with its steamships. Grace recognized the potential of air transportation in the commercial development of the South American countries in which it had extensive investments, and it had a great deal to offer to enhance that development. We cannot, from the evidence adduced, make out an unlawful intent to restrain aviation competition in the Grace participation in the formation of Panagra, and the history of Grace's activity in the affairs of Panagra preponderatingly demonstrates that it fostered and fought for Panagra development and expansion. To be sure, Grace sought continuously to control the management of Panagra, and its efforts were crowned with success in 1939. Its desire to control the management can as readily be explained as an aggressive business instinct, intensified in the light of the conflicting, containing attitude of Pan American, as well as from the standpoint of its asserted attempt to monopolize all transportation on the west coast. We are buttressed in our choice of the former in that the record before us fails to disclose any antitrust violations on the part of Grace vis-à-vis Panagra, unless it be *per se* violative of the Sherman Act for Grace to own the stock that it does in that company. We will defer discussion of that issue to later in this opinion.

Clearly, Grace did not contemplate joining in the venture as a mere investor, though the terms of its agreement with Pan American as disclosed in the two letters, supra, did not contemplate that it would actively manage the line. The question of its ascendency to that management, since it occurred in 1939 subsequent to the creation of the C.A.B., is one that the C.A.B. has always been in a position to remedy if it in fact is in contravention of the C.A.A. § 408(b) (49 U.S.C. A. § 488(b)).[13] The apparent reluctance of that body to entertain the issue probably is rooted in dilemma. If Grace were divested of the management Pan American would succeed thereto. The progression would be from merely theoretical to further and more complete actual restraint and suppression. If Pan American is ordered to divest itself of Panagra the question of Grace management of Panagra may then be disposed of by the C.A.B.

### Division of Territories

■ Consideration of the defendants' agreement or understanding with respect to the respective spheres of operations for the two airlines, when viewed in the light of the conditions under which they undertook, as foreigners, to establish an American system of international aviation in South America, the policy of this government and its stake in fostering their efforts, and the dedication of public monies involved,[14] as well as the relation of the parties one to the other and the nature of the industry itself, compels the conclusion on our part that it involved no violation of the antitrust laws.

The defendant airlines had to be self-contained enterprises involving large amounts of fixed capital outlay for facilities that would normally be made available to them in this country by governmental authorities. They had to build their own landing fields, provide their own meteorological service, and maintain

---

13. Cf. New York-Balboa Case, Order No. E-5737 (Sept. 21, 1951). See, also, C.A.A. §§ 409 and 415 (49 U.S.C.A. §§ 489 and 495).

14. For example, between 1947 and 1958 the government gave Pan American $61,480,000; Panagra $13,925,000 and Braniff $15,461,000 by way of pure subsidy.

their own communications system, and in connection with building up operating and traffic organizations they of course had to maintain offices in all of these countries and establish good will with the governments and peoples through whose territory the lines must pass. And in addition to technical and equipment problems they contended with substantial competition for the available traffic from foreign lines that had established themselves before the defendants and who were maneuvering for monopoly concessions that would have precluded defendants from their markets. The State Department actively assisted defendants in defeating the foreign company designs for monopoly concessions and in securing American operating rights along their routes. The contracts awarded by the Post Office Department defined the international route of the contractor, and so to a large extent defined the area of development and expansion of any such contractor. The Post Office policy during the years 1928 to 1938 was to award but one contract for each route, in effect to subsidize one American carrier in a particular sector. The ideal route pattern as envisaged by the C.A.B. today is to have two carriers, Pan American and a merged "Panagra-Braniff," and the only difference from that existing prior to Braniff's entry would be the extension of "Panagra-Braniff" to the United States. Competition among American carriers under the policy of the Post Office Department under the foreign mail contracts, was economically impossible, and most likely detrimental to the sound development of American flag service, which would have complicated or embarrassed the effective rendition of diplomatic assistance from the State Department, and actually cause a waste of public monies. Competition between Panagra and Pan American certainly was not encouraged by this government. On the contrary, there appears to emerge from the evidence presented a definite policy of the government approving a sort of "zoning" for the operations of the American international carriers in the nature of east and west coast spheres as was ultimately arranged between Pan American and Panagra. Agreement not to parallel each other's service in South America seems perfectly consistent with the air transportation policy of this country in those formative years. It is only with respect to the northern extension of both lines to the United States that restraint of competition between Pan American and Panagra whether by agreement or unilateral action, in our opinion, falls under the condemnation of the antitrust laws. This relates primarily or wholly to the question of Panagra's extension to a United States terminal.

There is no doubt that defendants came to agree upon a division of territories; the dispute relates to when such agreement came about and what its details were. Pan American says that it and Grace reached agreement prior to the formation of Panagra that Panagra was to operate only on the west coast of South America from the Canal Zone to Valparaiso, Chile, and that was to be the entire extent of its operations. Pan American was to conduct operations throughout the rest of South America, including operations within the interior of South American countries, as well as its other services in the Caribbean and Central America, and between the United States and the Canal Zone, for which areas it had already secured the United States mail contracts. By reason of the mail contract ultimately awarded to Panagra, its terminal in Chile was changed to Santiago, and the scope of Panagra operations was extended to Buenos Aires and Montevideo. The government apparently accepts Pan American's version of the agreement.

Grace on the other hand contends that their territorial agreement was entered into *after* Panagra's formation and was, in general terms, to the effect that Panagra was to operate on the west coast and in all the countries of the west coast through which its international mail line ran, as well as over the Andes to Buenos Aires and Montevideo, and that there was no intention one way or the other

contemplated *mutually* by them with respect to possible extension of Panagra's line to the United States. As for pre-Panagra agreement, Grace says that it was merely to combine their efforts, talents and resources in a jointly owned company to operate an air transportation service on the west coast, and specifically, to bid on the proposed mail contract for that west coast route. Grace contends that it was only in November, 1929, after Panagra's route had been extended by the Postmaster General at its request, to Buenos Aires, that any detail was added to their east coast-west coast understanding, and this concerned Panagra operations in the Argentine.

Pan American had organized an Argentine subsidiary (ALAS) in June, 1929, to operate locally in Argentina to give it legal standing there, and to develop cabotage business for Pan American's operations. Because of the operations of this subsidiary, ALAS, Panagra and Pan American reached an understanding whereby Pan American and ALAS had the exclusive right to Argentine traffic throughout that republic with the exception of that traffic between the points on Panagra's route—between Buenos Aires and Mendoza, Panagra had exclusive right, and between Buenos Aires and Montevideo, Panagra would compete with ALAS.

The understanding was again given substance after Pan American had acquired NYRBA, when in September, 1930, ALAS made some flights to Santiago from Buenos Aires, parallel to Panagra's route. Pan American put a stop to these flights when Grace complained.

Their agreement with respect to the Argentine figured again in the development of Panagra in 1935 when Pan American finally consented to Panagra operating a service from Tacna, Peru, to La Paz, Bolivia, on condition that there would result no prejudice to the arrangements or understanding relating to the traffic interests of Panagra in Argentina. This question arose because the Bolivia operations were sought by Panagra as a prerequisite to its instituting an alternate route to Buenos Aires through Bolivia and several Argentine cities. Panagra instituted such an alternate route to Buenos Aires in 1937. Pan American withheld its consent to that alternate route hoping to get Panagra to pay for a portion of the expense of its acquiring NYRBA, because NYRBA supposedly had incurred expenses in developing part of the route over which the new alternate route of Panagra's passed. No payment was ever made.

In early 1937 Panagra, at the invitation of the Colombian president, wanted to divert its international line into interior cities of Colombia, viz., Cali and Medellin. SCADTA had opposed this deviation and, in addition, threatened to extend its own line to Ecuador in competition with Panagra. Pan American opposed the proposed Medellin stop because it would divert traffic from its wholly owned subsidiary, UMCA, operating between Medellin and Panama. Panagra agreed to settle for the Cali stop, and Pan American helped overcome SCADTA opposition thereto, as well as to overcome the threatened competition of SCADTA to Ecuador. The Cali stop was approved by Panagra's board in January, 1938, Pan American's nominees abstaining.[15]

In 1951 Pan American's subsidiary, Panair do Brasil, at the instigation of the government of Brazil extended its routes from Rio to Santiago and Lima. Grace had sought to have Panagra apply to extend its routes from Lima to Rio some time earlier but Pan American would not agree.

We find that the agreement between the defendants as to spheres of operations and its evolution was substantially in the manner described by Grace. We accept the version of Pan American, not

---

15. After the Through Flight Agreement of 1946, discussed infra, page 44 et seq., Pan American approved of Panagra's extension to Medellin and Bogota, Colombia.

as respects mutual agreement between it and Grace, but as representing its own intentions for the destiny of Panagra.

An agreement not to duplicate or parallel each other's service in South America would seem to be consistent with the best interests of this country in establishing and developing American international aviation in the years from 1929 to 1938, and it was this type of competition from Pan American, through its subsidiary ALAS, and through SCADTA which Pan American controlled at the time, against which Grace invoked successfully the territorial agreement. Pan American, through its negative control of Panagra was always capable of preventing paralleling of its routes by Panagra, and Pan American over the years has in addition successfully delayed or prevented within-South America extensions of Panagra which would not have resulted in paralleling its operations.

■ For the purposes of this suit, however, we find sufficient basis in the Pan American suppression of Panagra efforts to extend to a United States terminal upon which to predicate our conclusion that Pan American monopolized that sector of commerce between the United States and South America and between the United States and the Canal Zone to warrant relief against it.

### Pan American's Restraints Against Panagra

The thrust of the government's evidence was directed to the alleged monopolization or attempted monopolization by Pan American of air transportation between the United States and South America. While it also charges monopolization by Grace of air and steamship transportation, that charge is treated infra, page 49 et seq.

The market or the "area of effective competition" which is the subject matter of this inquiry is air transportation between the United States and South America, particularly the west coast. Whether it should include only American flag carriers or all carriers is debatable, but to resolve it most favorably to the defendants we will treat the problem separately and jointly. It would seem fair, too, because of the areas involved to subdivide, as the government has, several appropriate markets or relevant market segments and correlate these to United States flag carriers and all carriers.

In the early 1930's less than 5% of the passengers between the United States and South America were carried by air, but since 1954 the airlines are handling 80% of such traffic. Pan American is the largest international airline in the world and in 1957 flew 3,500,000,000 passenger miles. One-third of its business is in Latin America.

There does not exist a completely accurate record of statistical data measuring the volume of traffic moving by air or sea between the United States and South America. The available sources developed by different agencies of the government and using somewhat different reporting procedures are those prepared by the C.A.B. and the Immigration and Naturalization Service (I.N.S.). The OD survey of the C.A.B. shows the origin and destination of air travellers and their complete air journeys; its shows the airlines involved in carrying people between those points and is limited to passengers who fly on commercial airlines in scheduled flights and on a revenue basis. It is limited, however, to carriers, as far as international traffic is concerned, who are certificated by the C.A.B. and includes only those passengers who either entirely or in some part of their journey used United States flag air carriers. It does not cover passengers who travelled out of the United States entirely on foreign flag lines. In addition it is published for only two months of the year, viz., the months of March and September. In this case the latest one used by the government economist was the September, 1957, survey.

The other source of statistical information is the I.N.S. series. This information does cover foreign flag carriers but it does not provide the name of the carrier involved. It makes no distinction between passengers who fly on a

non-revenue basis or on non-scheduled flights or in non-commercial planes. It does not include passengers in a military class. Its total statistics, therefore, are larger than the comparable statistics for the United States flag carriers as collected by the C.A.B. and therefore are more advantageous to the defendants if those statistics are used exclusively.

We find that by the use of both, a reasonably reliable picture of the relative positions of Pan American and Panagra is reflected and their relative participation in the traffic shown.

From these statistics it is obvious that Pan American and Panagra have retained a very high degree of dominance over other United States flag airlines in the transportation of passengers between the United States and South America. In fact they have either together or separately participated in the movement of from 75% to 88% of the passengers who used United States flag airlines between the United States and South America during the period 1950–1957.

With respect to such journeys between points of origin (or destination) in 16 eastern states [16] and South America, Pan American and Panagra have participated in carrying from 88% to 96% of the passengers during 1950–1957.

Panagra is the dominant United States flag airline participating (almost entirely with Pan American) in the movement of passengers between the United States and points in western South America (western Colombia, Ecuador, Peru, Bolivia, Chile and Argentina, other than Buenos Aires). During the 1950–1957 period Panagra carried between 79% and 86% of this traffic and from 84% to 93% of the eastern United States, western South America traffic.

Pan American is the dominant United States flag carrier participating in the transportation of passengers between the United States and eastern South America (eastern Colombia, Venezuela, the Guianas, Surinam, Brazil, Paraguay and Uruguay). Without any participation by Panagra it accounted for 66% to 85% of this traffic and between 84% to 95% of the eastern United States-eastern South America traffic during the 1950–1957 period.

Both lines, Panagra and Pan American, fly to Buenos Aires by separate routes (Panagra via western South America and Pan American by eastern South America) and are obviously competitive in that category. Together they have accounted for 92% of all the passengers carried by United States flag airlines between the United States and Buenos Aires, and 94% of such traffic between eastern United States and Buenos Aires during the 1950–1957 period. During this period Panagra (in participation primarily with Pan American) carried more than one-half and Pan American (with no Panagra participation) carried two-fifths of the United States-Buenos Aires traffic on United States flag lines.

Using the I.N.S. statistics so as to round out the picture and include the foreign flag carriers, we find that Pan American and Panagra have participated in the transportation of approximately 50% of the total number of passengers travelling by air between the United States and South America on United States flag and foreign flag carriers during the period from 1952–1957. Approximately one-sixth of the total traffic was carried by other United States flag carriers and about one-third was accounted for by foreign flag carriers in this period.

The dominance of Pan American and Panagra in the United States-South America traffic market is obvious since the traffic that was not carried by Pan American and Panagra (approximately 50% of the total) was divided among at

16. Includes the New England states and the states of New York, Pennsylvania, New Jersey, Delaware, Maryland, District of Columbia, Virginia, North Carolina, South Carolina, Georgia and Florida. It is estimated that this area accounts for about two-thirds of the United States-South American passenger traffic.

least ten [17] other airlines, i. e., eight foreign flag carriers and two other United States flag carriers. In this connection, too, it should be observed that two of the foreign flag carriers, AVIANCA and AVENSA, that carry passengers between the United States and South America are "affiliates" of Pan American, i. e., Pan American owns a substantial minority share of their outstanding stock.

The I.N.S. statistics show that with respect to passenger traffic between the United States and the four western South American countries (Ecuador, Peru, Bolivia and Chile), Panagra participated in carrying almost 75% of the total traffic in the 1952–1956 period and about one-half of the total in 1957. Between the United States and the seven eastern South American countries (Venezuela, Brazil, British Guiana, French Guiana, Surinam, Paraguay and Uruguay), Pan American alone accounted for about two-fifths of the total traffic during the period from 1952–1957. Between the United States and Argentina, Pan American and Panagra shared better than three-quarters of the traffic during the 1952–1957 period. Between the United States and Colombia, Pan American and Panagra (each serving different parts of that country) accounted for one-third of the total traffic in the 1952–1957 period, while the foreign flag traffic was three-fifths of the total. However, practically all of this foreign flag traffic is carried by AVIANCA.

Pan American has submitted evidence and expert testimony on the relevant markets and area of effective competition. Some of its statistics, however, include sea passenger traffic added to the air traffic, thus considerably diluting the percentages testified to by the government economist and supported by its statistics. This was done in a post-trial brief based upon certain evidence the government submitted insofar as the complaint related to Grace. We reject this combination of air and sea traffic figures as not close substitutes and not truly the same relevant market.[18] It is significant, too, that at the trial Pan American's expert witness and employee produced no statistics from their own records showing the share of air passenger traffic by Pan American or Panagra in any relevant market.

Accepting the government's evidence and rejecting Pan American's as deficient, we find that there is and has been for many years active substantial competition between Pan American and Panagra in the transportation of air passengers to the United States and South America to a substantial degree and that, but for the Pan American suppression of Panagra, that competition would have been much greater.

Finding, as we do, the existence of such competition the next inquiry is whether defendant Pan American monopolized or attempted to monopolize such trade and commerce. We find that it did both.

We need not discuss alleged violations of § 1 of the Sherman Act in this part of the opinion. We have heretofore found no conspiracy between Grace and Pan American to restrain or monopolize, and we concluded in substance that their original joinder was not a combination in restraint of trade; we found that their combination was a legitimate one with legal ends—to foster the development of a new form of transportation. That the combination, or joint enterprise subsequently developed differences of opinion as to the growth and development of their jointly owned company does not, in our opinion, operate to make their joinder or combination, *in limine*, one in restraint of trade, or their combination presently, *qua* combination, one in restraint of trade.

The antitrust restraints that we find here requiring judicial remedy were uni-

17. According to Pan American there are at least 18 foreign airlines operating between the United States and South America or Panama.

18. Cf. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 612 note 31, 73 S.Ct. 872, 97 L.Ed. 1277.

laterally imposed by Pan American and for that reason, if they are illegal at all under the Sherman Act it must be under § 2 thereof. More specifically, they must constitute monopolization or attempt to monopolize.

In our opinion, Pan American's successful blocking of Panagra's extension to its own terminal in the United States constitutes an unlawful exercise of the power it had to exclude Panagra as a competitor in the United States-South American market, and to thereby maintain its virtual monopoly position over that market at least until the entry thereinto of Braniff in 1948. Thereafter and to date, it remains the dominant carrier in that market and maintains its power to participate in substantially all United States origin or destination traffic carried by Panagra through its continued suppression of a Panagra-United States extension.

While we were not provided with any statistical breakdown of the passenger traffic carried by air between the United States and South America for the years prior to 1950, it is clear that Pan American and Panagra's share was 83% or better. And it is safe to say that prior to 1947 substantially all such traffic was carried by Pan American alone. It was not until then, 1947, when the C.A.B. approved the Through Flight Agreement, that Panagra planes actually flew beyond the Canal Zone to the United States; but then it was only in participation with Pan American pursuant to such agreement.

Since 1938 half of Panagra's board of directors (Grace nominees) sought to file a voluntary application with the C.A.B for an extension of Panagra's routes to the United States. Pan American would not consent to such action and directed its nominees on Panagra's board accordingly, because "it would not be in the interest of our stockholders [Pan American stockholders] for our directors to authorize an application by [Panagra] to extend north of [the Canal Zone] in competition with Pan American."

Pan American has never retreated from this position which is predicated upon the proposition that Panagra is part of the Pan American system; that it (Panagra) was so set up to be the west coast link of the Pan American system, and that if it were permitted to extend to a United States terminal its character would be changed to that of a competitive carrier. Pan American has expressed the fear that if Panagra were permitted its own route to Miami the effect upon Pan American's service between the Canal Zone and Miami would be disastrous, because the greater portion of Pan American's traffic between those points on its direct flights was traffic destined to or originating at points on Panagra's routes. Generally, all through traffic between points on Panagra's west coast route and Miami or other United States cities conveniently reached through the Miami gateway would be almost wholly diverted from Pan American. The same would go for most any west coast traffic bound for a United States point conveniently reached from any United States terminal to which Panagra may be certificated, whether it be Miami, New Orleans, New York or any other city.

It is beyond dispute therefore, that Pan American blocked Panagra's independent entry into the United States-South American market in order that it may continue to share in substantially all traffic carried by Panagra and bound for the United States, or originating in the United States and bound for points on Panagra's west coast routes. Prior to Braniff's entry into the market (and Delta's too), and prior to the Through Flight operations, Pan American enjoyed a virtual monopoly of the United States-South American market. We assume that it had come by that monopoly legally however, originally; but we find that it maintained that monopoly illegally, in contravention of the Sherman Act when it utilized its stockholdings and representation thereunder on Panagra's board of directors to frustrate Panagra's entry into the market. Pan American's justi-

fication for its blocking actions is bottomed upon a fallacious predicate; Panagra is *not* part of the Pan American system except to the extent that it is reduced to that status through the subjugating exercise of Pan American's negative control over its destiny. Panagra is not a subsidiary of Pan American; its co-equal stockholder, Grace, never so intended it to be (and never intended to be a mere investor in Panagra), nor has Panagra's abstention from independent entry into the United States-South American market been the result of *concerted* action between it and Pan American. If Pan American were the majority shareholder in Panagra or if Panagra were a wholly owned subsidiary of Pan American it might make a decisive difference in this case. Cf. Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), pp. 32-34. If Panagra were wholly owned by Pan American we have no doubt that its extension to a United States terminal would have been effected decades ago.

Pan American, to be sure, has contributed substantially to the success of Panagra within the territorial limits to which Pan American has permitted its operations. Pan American has always considered Panagra as part of the Pan American system, and its major premise is that its capital investment in Panagra was dedicated to a limited operation on the west coast from the Canal Zone south.

Panagra, however, is an independent entity and the dedication of American taxpayer money,[19] without which it could not have survived as Pan American so readily argues, is paramount to any private investment consideration due Pan American. It most certainly must have been thought by this government that it was subsidizing two air transportation companies to develop the South American markets, each with equal opportunities in time to operate to this country and not necessarily by parallel routes.

If the competitive effect of a Panagra extension to the United States would have been as disastrous as feared by Pan American, it would have been a genuine issue for it to urge before the C.A.B. in opposing such extension which that body would have to weigh together with the public convenience and necessity in favor of the extension. Pan American then and since has arrogated to itself the function of determining what the public convenience and necessity requires. The economic arguments advanced by Pan American to justify its actions in preventing Panagra's extension to the United States are irrelevant to the issues of this case. Its intentions in excluding Panagra from that sector are beyond doubt.

While we have discussed the market which we find Pan American has monopolized or attempted so to monopolize, as the United States-South American sector of air transportation of passengers by all carriers, foreign and American, there is a more limited market over which Pan American has maintained a more complete monopoly and which would appear to be one that may be appropriately considered separately. That is the United States-Canal Zone sector of air transportation. Under the Civil Aeronautics Act such transportation would be deemed "overseas" transportation, as distinguished from "foreign" transportation, and as such would be reserved exclusively to United States flag carriers. Cf. Pan American-Matson-Inter-Island Contract, supra.

Prior to Braniff's certification and entry into this market, Pan American was the sole United States carrier therein. Its actions in suppressing and thereby excluding Panagra from the United States terminal to which Panagra aspired are equally applicable to a consideration of this more limited market, and compel the same conclusion of monopoly or attempted monopoly.

19. See footnote 14 supra, also, Local, Feeder and Pick-up Air Service Case, 6 C.A.B. 1, 3.

Pan American argues that under the C.A.A. exclusive control over the entry into the market is vested in the C.A.B. and the President (§§ 401 and 801, 49 U.S.C.A. §§ 481 and 601) and that, therefore, it does not have power to exclude competitors, i. e., monopoly power. It does not and cannot deny, of course, that it has the power to and has effectively excluded Panagra from the market in question.

In our opinion, under the circumstances of this case Pan American need not have the affirmative power to ultimately approve Panagra certification for its own route to the United States to qualify as a monopolist. What Pan American seeks to do is to confound power of admission with power of exclusion. It is the exercise of the latter that the Sherman Act condemns.

We would like it clearly understood that it is not our opinion that every defendant who exercises similar negative control over a single potential competitor and thereby excludes such competitor from a relevant market necessarily monopolizes thereby. It is a relative concept which can only be applied in a given context. Here, the excluded competitor is the most potential of a very limited number of competitors and one that enjoys a substantial share of the relevant market, and in which share the exclusionary action of Pan American guarantees it participation. One result is that competition between the two for their significant shares of the market is to a substantial degree restrained. Other factors we considered are the nature of the industry, the size and strength of the two companies involved, and the limited market potential.

We feel that the affirmative blocking of a Panagra application to the C.A.B. is sufficient under the facts presented to make out the violation by Pan American of monopolization and that the following history of Pan American's actions gives a definitive picture of its 20-year subjugation and restraint on Panagra. It will also show the attitude of the C.A.B. and its consequent frustration towards Pan American's antagonistic and purposeful restraint.

We start with 1938, the turning point for United States flag international aviation. With the enactment of the C.A.A. that year the period of foreign airmail contracts ended; under the Act mail pay or subsidy was to depend, not upon contract, but upon the needs of each certificated carrier in contributing to the maintenance and development of air transportation. In accordance with the objectives set out in § 2 (49 U.S.C.A. § 402) thereof, in sum, to promote an economically and technically sound air transportation system, the C.A.B. was authorized to prescribe the extent of air transportation which each certificated carrier may engage in, and to allow for regulated and economic competition designed in part to stimulate research and experimentation and to induce refinements which would inure to the benefit of the foreign and domestic commerce, the Postal Service and the national defense.

A policy of regulated competition replaced the "no-parallel" policy of the first decade, and with it and the new policy with respect to subsidy, it became feasible for Panagra to seek to extend its routes to the United States. Such an extension would give it direct access to one or more of the major gateways for through traffic between the United States and Latin America and was entirely normal and desirable from Panagra's viewpoint as it would then no longer be so dependent upon connections with Pan American at the Canal Zone for onward passage of a large part of its traffic travelling between the United States and the west coast of South America and Buenos Aires. See Panagra Terminal Investigation Case, supra, at 671. However, such an extension of Panagra represented a serious competitive threat to Pan American which ran counter to the latter's philosophy that it alone should conduct all international commercial air transportation operations under the United States flag, a philosophy which Pan American unavailingly urged upon the C.A.B. whenever competition for Pan American

was proposed. See e. g., American Export Airlines, Inc., Trans-Atlantic Route Service Case, 2 C.A.B. 16; Northeast Airlines, Inc., North Atlantic Route Case, supra at 324; Latin American Air Service Case, supra at 861, and Hawaiian Airlines, Ltd., Hawaiian Case, 7 C.A.B. 83, 103.

Grace's efforts of 1938 to secure Pan American cooperation for a northern extension of Panagra resulted in a compromise embodied in an agreement dated February 14, 1939, whereunder Grace nominees succeeded to the presidency and management of Panagra, Pan American promised to provide an adequate connecting service between Miami and the Canal Zone,[20] and Grace was to cease agitating for the United States extension of Panagra. However, in late 1940 Grace again pressed the question of Panagra's extension because at that time American Export Lines was evidencing an interest in a New Orleans-Canal Zone service which Grace feared might eventually extend down the west coast in competition with Panagra. Grace's suggestion that Panagra file an application with the C.A.B. for this route was rejected by Pan American which, incidentally, had already filed its own application therefor. Pan American further decided that its nominees on the Panagra board would not attend any meetings at which this subject was to be discussed. Thereafter, Grace brought the matter before the C.A.B. and that body ultimately instituted a proceeding which became known as Docket 779, the Panagra Terminal Investigation. The intermediate steps are set out chronologically in the C.A.B. opinion in the case as follows:

"When efforts to secure the filing of an application by Panagra failed, Grace, on May 3, 1941, filed a petition for leave to intervene in the New Orleans case alleging that since Panagra was not filing an application Grace proposed to file an application in its own behalf for a certificate for a route between the United States and the Canal Zone. Grace was granted leave to intervene, but did not file an application for a certificate during the time that case was pending.

"On December 16, 1941, Grace filed a petition and complaint, Docket No. 707, requesting the Board to institute a proceeding pursuant to section 401(h) of the Act to alter, amend, and modify Panagra's certificate of public convenience and necessity so as to make the northern terminal of its route a point in the United States such as Miami or Tampa, Fla., or New Orleans. On April 29, 1942, Grace filed a second complaint, Docket No. 744, requesting the Board to require Pan American Airways Corporation, pursuant to section 411 of the Act and sections 7 and 11 of the Clayton Act to cease and desist from certain matters alleged by Grace to be in violation of those sections, and to divest itself of its ownership of the stock of Panagra to the extent necessary to divest itself of its present negative control of Panagra; and also renewing its request in Docket No. 707.

"No formal steps were taken by the Board in connection with the Grace petitions in Dockets Nos. 707 and 744 until September 1942. During this period all action in the New Orleans case also was postponed under the Board's policy, announced December 12, 1941, of suspending further action in all proceedings pending before it under sections 401 (d) and 401(h) of the Act 'in order that the immediate and maximum attention of air carriers and their personnel, and that of the Civil Aeronautics Board, as well as other Government agencies concerned, may be available for the most efficient

20. Pan American's connecting service was a source of much friction between defendants and its alleged inadequacy gave rise also to threats by Grace to inaugurate its own air transportation service between Miami and the Canal.

discharge of the emergency demands' arising out of the war.

"However, the Board did explore the possibility of working out a voluntary settlement of the controversy between Pan American and Grace. Numerous conferences were held by the Board with both parties. Finally, the Board suggested that the parties enter into an agreement under which sufficient shares of the two stockholders would be transferred to an independent public voting trustee or trustees to permit the election to the Panagra board of an independent director or directors, or under which such an independent public director or directors might be otherwise appointed, who would be able to break the deadlock resulting from the equal division of the ownership of Panagra stock between Pan American and Grace. After it became apparent that no satisfactory voluntary arrangement could be mutually agreed upon by the parties and that all efforts to mediate the differences between them would be unsuccessful, the Board, on September 10, 1942, * * * [instituted Docket 779]" 4 C.A.B. 670, 671–72.

In May, 1944, the C.A.B. dismissed the proceeding without reaching the merits of the question of the public convenience and necessity involved in a Panagra extension. The dismissal was on the ground that the Board was without power to compel such an extension in the absence of a voluntary application from Panagra. The Second Circuit Court of Appeals, W. R. Grace & Co. v. C. A. B., 1946, 154 F.2d 271, reversed the C.A.B. and remanded the proceeding saying: "if Grace * * * could prove that the opposition of Pan American * * * to Panagra's applying for an extension was due to 'illegality and fraud' it would follow that this proceeding should be regarded as a voluntary application for the extension" (at pages 281–282). On June 10, 1946, the Supreme Court granted Pan American's petition for certiorari, Pan American Airways Corp. v. W. R. Grace & Co., 328 U.S. 832, 66 S.Ct. 1378, 90 L. Ed. 1608.

In the meantime, in consolidated hearings, the C.A.B. had been considering a number of applications by carriers seeking, *inter alia,* certificates to engage in operations between the United States and the Canal Zone. The C.A.B. Examiners and its Public Counsel reported that while the extension of Panagra to a terminal in the United States would best serve the public interest they considered such recommendation to be foreclosed by the decision of the Board in Docket 779, and consequently, they recommended that routes between the United States and the Canal Zone be awarded to other carriers. The brief of the Public Counsel noted, in substance, that Panagra was entitled to a certificate for a United States-Canal Zone route which would provide the west coast countries in South America with the convenience of one-carrier service to the United States, but since the action of Pan American prevents the recommendation of the "best possible service, we must turn to the next best solution." W. R. Grace & Co. v. C. A. B., supra, 154 F.2d at pages 282, 283, note 5.

Nevertheless, the C.A.B. thereafter divided evenly on the question of authorizing other carriers to South America and for want of a majority, additional services between the United States and the Canal Zone also failed. The President thereafter directed the Board to provide for the extension of an additional carrier to South America and Braniff was ultimately selected. In the course of its opinion the C.A.B. had occasion to say that it had long recognized the desirability of a voluntary application which would permit a determination by it of the question of extending Panagra from the Canal Zone to a point in the United States, and that if such extension were made to Miami or New York, or some other point on the eastern seaboard, the eastern part of the United States would be afforded a fast direct service to the west coast of South America and to Buenos Aires.

The Board declared that Pan American and Grace, in the public interest, "cooperatively should enable Panagra to apply for access to the east coast of the United States." Latin American Air Service Case, supra, at 914.

Thus, while it is true that the C.A.B. has never explicitly stated that it would grant an application if one were voluntarily presented by Panagra, it is unrealistic to suppose that it would not have. We find it difficult to conclude otherwise than that the Board waited in vain for such an application, or stated differently, for Pan American to cease blocking Panagra in the interest of the public welfare.

Braniff's certification was in May, 1946. Pan American and Panagra entered into the Through Flight Agreement in July, 1946. Under this agreement Pan American theoretically charters Panagra planes on flights north of the Canal Zone. Actually, what Pan American does is to share with Panagra in the expenses and profits of such flights by Panagra planes flying over Pan American's routes.* After the Board certificated Braniff, Panagra was faced with two alternatives: (1) to enter into the Through Flight Agreement and immediately improve its competitive position with Braniff, or (2) continue to press for its own certificates. Under the latter course Grace, on behalf of Panagra, would continue the litigation which it had initiated before the C.A.B. in 1941 which was then pending review by the Supreme Court on certiorari to the Second Circuit.

The outcome of the appeal of course was uncertain, and assuming it were favorable to Panagra, the matter would still then have to return to the C.A.B. for a consideration of the merits of the action. Panagra simply could not afford the delay which this course of litigation would entail. Its economic life hung in the balance. If Panagra did not get to the United States, at least by way of a through flight interchange agreement with Pan American, and if Braniff commenced such operations under the authority granted by the Board, Panagra's economic position would rapidly deteriorate. Cf. New York-Balboa Through Service, Reopened, 18 C.A.B. 501, 505.

Grace and Panagra succumbed to the restraint of Pan American and acquiesced in the Through Flight Agreement. The C.A.B. approved the agreement in May, 1947; ** it did not approve the suppression of Panagra by Pan American in the process as Pan American contends. Such approval was in no sense necessary to do that which was authorized. (See further discussion re Pan American's claim of immunity infra, at page 45.)

The loser of course, as always, was the public. Braniff has proved to be an ineffective competitor; the United States share of the market has declined; foreign competition has increased, and the federal subsidy has greatly increased.[21] The C.A.B. has expressed a fear for the economic effects of a successful conclusion of this suit by the Attorney General, and the emergence as a consequence of an independent Panagra in South America. New York-Balboa Through Service, Reopened, supra. It should be noted that in 1957 Grace, on behalf of Panagra, filed with the C.A.B. applications for Panagra's own routes to Miami, New York and to the west coast of the United States. Action thereon is suspended pending the outcome of this suit.

---

* In 1955 the C.A.B. approved an interchange agreement among Pan American, Panagra and National Airlines under which Panagra's planes fly to New York from Miami over National's routes.

** On November 24, 1947, on Pan American's motion the Supreme Court dismissed the writ of certiorari previously granted, as moot. 332 U.S. 827, 68 S. Ct. 203, 92 L.Ed. 401.

21. In 1946, Pan American's Latin American Division showed a profit of $2 million and in 1953 it required $11 million subsidy; Panagra in 1946 required just under $1 million which rose to over $2 million in 1953; Braniff required about $560,000 in 1948 and its break-even need in 1953 was over $3 million. New York-Balboa Through Service, Reopened, supra (concurring opinion).

Pan American has monopolized or attempted to monopolize the market in issue and in the process has seriously restrained competition from Panagra and caused the creation of a situation that cannot be righted so long as it retains the negative control that it now possesses over Panagra.

Pan American's conceptions of the perpetual limited character of Panagra operations are now and ever have been based on its own unilateral intentions in joining with Grace to form a west coast airline. That intent, and the economic arguments which it has advanced in its brief against Panagra's extension to the United States are no defense to the monopoly charges *sub judice*. Its economic arguments would have been proper to urge before the C.A.B. upon hearings on the merits of an application by Panagra for such extension. While Pan American's conduct in preventing Panagra from clearing the first hurdle for that extension, to wit, presentation of an *application* to the C.A.B., may be understandable from a selfish business standpoint of one faced with making a choice, nevertheless the quandary was of Pan American's own making and its choice was unlawful.

### Pan American Immunity

Pan American asserts that it is immune from antitrust violations because the Civil Aeronautics Board approved the arrangements made between it and Grace respecting the area of Panagra's operations. It points out that in 1947, again in 1950 and again in 1955 the C.A.B. approved the Through Flight Agreement between Pan American and Panagra and the related Parent Company Agreement between Pan American and Grace. It states that the approval was given after a most thorough inquiry from which it appeared abundantly clear that the Through Flight Agreement was in lieu of Panagra's coming to the United States and represented a reconciliation and settlement of the controversy between Pan American and Grace over Panagra's coming to the United States.

It relies on § 414 of the C.A.A. (49 U. S.C.A. § 494) which relieves any person affected by an order of the C.A.B. made under sections 408, 409 or 412 (49 U.S.C. A. §§ 488, 489, 492) of the operations of the antitrust laws.

The claim of immunity is without substance because no such approval was ever sought or obtained from the Civil Aeronautics Board.

What the Board approved was in effect an interchange agreement between Pan American and Panagra which was completely silent with respect to the problem here involved and a related management agreement which contained, among other things, a provision that Pan American would consent to a Panagra application for service to the United States in the event of transfer, modification or cancellation of Pan American's own certificate. This provision consenting to an extension in the event of the contingencies described did not negative consent under other circumstances or in terms constitute an undertaking or an understanding that Pan American would continue to block Panagra's efforts for expansion.

One of Pan American's principal officers testified, "There was nothing in the agreement * * * to prevent Panagra from applying for an independent franchise to enter the United States" and that there was no side agreement or understanding to that effect. He was specifically asked, "Is it understood between the parties that Panagra will not so long as this contract is in effect apply for such independent entry?" He answered, "No." The president of Panagra when asked whether the agreement implied "that those who run the affairs of Panagra have an understanding that Panagra will not seek to come from the Canal Zone to the United States," he replied, "I do not so testify and that is not the fact. The only agreement between us on that point is in these papers."

Not a word in the opinion of the Board (8 C.A.B. 50) approving the agreements is devoted to this question, nor is there any basis for an inference that it under-

stood that it was approving a prohibition against Panagra's seeking an independent franchise.

The Board's approval of the Parent Company Agreement was only in relation ·to the interchange agreement. It was done in order to prevent avoidance of its jurisdiction over contracts affecting air transportation (and which would be subject to approval if made by operating carriers) through the device of their being made by parent companies not in themselves operating carriers and whose contracts would not normally be subject to the Board's approval.

■■■ Since the contracts do not specifically provide that Panagra should not seek its own certificate and the parties themselves testified that the contracts should not be so construed the Board cannot be held to have approved and granted antitrust immunity to Pan American to use its negative control over Panagra to prevent its applying to the Board for its own certificate to fly to the United States, nor has it ever approved or granted antitrust immunity in relation to Pan American's and Grace's control over Panagra. This control antedates the Civil Aeronautics Act and is beyond the purview of § 408.[22] Exemptions from the antitrust laws are not favored and should be accorded only on a showing of compliance with the precise manner and method prescribed by Congress. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226-227, 60 S.Ct. 811, 84 L.Ed. 1129. This has not been done.

### Primary Jurisdiction

Pan American in its post-trial brief has raised the defense of primary jurisdiction. It argues after trial that the allegations of the complaint are within the jurisdiction of the Civil Aeronautics Board and the President. Therefore, the court should not decide the matters in issue until after the Board and the President have acted.

■■ The primary jurisdiction rule is, "a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." Far East Conference v. United States, 342 U.S. 570, 574-575, 72 S.Ct. 492, 494, 96 L.Ed. 576.

Whether or no such defense should have been raised by motion or by answer in accordance with Rule 12 F.R.Civ.P., 28 U.S.C.A. when the complaint was served six years ago is academic since we find it without merit. Parenthetically, although of no legal significance, this latest tactic of Pan American is characteristic of its litigious nature and of its determination to continue and persevere in its restraint on Panagra.

■■ There can be no question that only a United States District Court has jurisdiction in actions under the Sherman Act, and that the Civil Aeronautics Board does not (15 U.S.C.A. § 4). The necessary defendant W. R. Grace and Company, not being an air carrier, would not ordinarily be subject to the jurisdiction of the Board, except perhaps on the question of acquisition of control and management of an air carrier. See note 13, supra.

In S. S. W. Inc. v. Air Transport Ass'n of America, 1951, 89 U.S.App.D.C. 273,

22. Railroad Control of Northeast Airlines, 4 C.A.B. 379, 386; National Air Freight

Forwarding Corp. v. C. A. B., 1952, 90 U.S.App.D.C. 330, 197 F.2d 384, 389.

191 F.2d 658, 661–662, the court analyzed the approach to accommodation of court and agency roles in the following language: "[I]n each case brought against a regulated company under the antitrust laws, the subject matter and remedy afforded by the regulatory statute are compared with that of the antitrust laws. If the latter either cover subject matter outside the scope of the Commission's power or provide a remedy which the Commission may not give, then they remain in effect to that limited extent. This sort of approach gives the greatest possible effect to congressional intent. It subjects problems intended to be dealt with in a uniform manner within the framework of a particular industry to the agency empowered to regulate that industry. At the same time, it gives effect to the antitrust laws in those areas not carved out from them by more specific economic regulation."

█ The complaint in this case relates to many matters that existed prior to the creation of the C.A.B. and over which the C.A.B. would have no jurisdiction. In addition, the major relief prayed for in the complaint is that the court order Pan American and Grace to divest themselves of their stock holdings and other interests in Panagra. Such relief or the power to grant it is not vested in the Civil Aeronautics Board as to pre-1938 acquisition [23] and such power exists only in a court of equity. In fact there is no provision in the antitrust laws for such a drastic remedy. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 602, 71 S.Ct. 971, 95 L.Ed. 1199.

Applying the suggested test in Air Transport Ass'n, it is clear to us that so much of the subject matter in the government's complaint is outside the scope of the Board's power and it seeks a remedy which the Board may not give, that Pan American's argument and motion, if it is a motion addressed to the primary jurisdiction of the Board, must be and is denied.

As a practical matter this case is here because the Civil Aeronautics Board found itself powerless to act and requested the Attorney General on two occasions to institute this suit.

Claim of Per Se Violation by Grace

The government contends that the Sherman Act makes unlawful the mere ownership or control by a steamship company of an airline operating a parallel route.

Leaving aside for later discussion the factual questions whether or no Grace competes with Panagra and whether Grace has in any respect exercised any restraint on Panagra, it is undisputed that Grace owns the Grace Line and that it carries the bulk of passengers who travel by sea between the Atlantic coast of the United States and the west coast of South America.

The government stakes its claim of *per se* violation on a series of railroad cases relating to mergers of competitive transportation companies and a district court case in Hawaii. The railroad cases the government relies on are Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679; United States v. Union Pacific R. Co., 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124, and United States v. Southern Pacific Co., 259 U.S. 214, 42 S.Ct. 496, 66 L.Ed. 907. We hold that these cases are inapposite. In Northern Securities Co. the problem related to the acquisition by banking interests through a holding company of the controlling interest in Northern Pacific Railroad and the Great Northern Railroad, which systems operated parallel lines through the northwest. Actually the roads served different geographical areas although they had common termini and the actual competition between the two was small. The Supreme Court in striking down the arrangement held that (193 U.S. at page 327, 24 S.Ct. at page 452), "[t]he mere existence of such a combination and the power acquired by the holding company as its trustee, con-

23. See note 22, supra.

stitute a menace to, and a restraint upon that freedom of commerce which Congress intended to recognize and protect, and which the public is entitled to have protected." In Union Pacific the Supreme Court again held that the consolidation of two great competing railroads by a transfer to one of a dominating stock interest in the other created a combination which restrained interstate commerce. In the Southern Pacific case, the court again condemned as a menace to freedom of commerce the combination, and resulting unified control, of established and naturally competitive rail systems, springing from the formation of holding companies rather than as a result of normal and natural growth (259 U.S. at page 230, 42 S.Ct. at page 498).

None of these cases presents a situation comparable to Grace's interest in Panagra in 1929 but rather, involve combinations of railroad giants of many years existence where the obvious purpose was to eliminate competition. It is apparent that the principle upon which these cases were decided applied to combinations of existing companies which were in substantial competition with one another prior to their combination. Cf. United States v. Columbia Steel Co., 334 U.S. 495, 531, 68 S.Ct. 1107, 92 L.Ed. 1533; Handler, Industrial Mergers and the Antitrust Laws, 32 Columbia Law Review 179, 212; Friedmann, Antitrust Law and Joint International Business Ventures in Economically Underdeveloped Countries, 60 Columbia Law Review 780.

In 1929 Grace's 50% ownership in the joint enterprise to establish a system of transportation which did not theretofore exist and which participation appears to have been of considerable importance in the decision of the Postmaster General in awarding Panagra the mail contract for the west coast of South America is, to our mind, not a *per se* violation of the antitrust laws. Except for the district court decision in Hawaii discussed hereafter there never before has been such a holding and the history of Grace's 50% participation in Panagra

has not demonstrated any result thereof that must form the basis of a *per se* doctrine, i. e., that Grace's half ownership in Panagra from its very nature must result in restraints injurious to the public. Grace's stock ownership in Panagra cannot be said to have such a "pernicious effect on competition and lack of any redeeming virtue" as to conclusively presume that ownership to be an unreasonable restraint on trade and commerce. Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545.

The government originally relied on Hawaiian Airlines, Limited v. Trans-Pacific Airlines, Ltd., an unreported case (Civil 817, D. Hawaii, 1949), as an authoritative decision on the "precise issue." We surmise that the government no longer places such reliance on this case. Actually it was an oral decision of two sentences by Judge Metzger on a motion for summary judgment. In that case the Inter-Island Steamship Navigation Co., Ltd., had been operating a steamship service in the Hawaiian Islands from 1883. In 1927 Hawaii passed a statute designed to encourage the organization of an air carrier within the territory by creating certain tax exemptions. In 1929 Inter-Island organized the Hawaiian Airlines. Having failed to interest the public in a subscription of the air carrier's stock, Inter-Island took up the majority of the shares and from 1929 through the early 1950's both the ship and air operations were carried on by it. During the same period its steamship operations were curtailed considerably. In 1947 Trans-Pacific Airlines, which also operated in the area, filed a triple damage counterclaim under the Sherman Act against Hawaiian and Inter-Island, alleging the mere ownership of the airline by the steamship company violated that law. At the conclusion of the arguments on a motion for summary judgment the court rendered the following decision from the bench: "It is my firm opinion that the creation of Hawaiian by Inter-Island to operate over routes that were parallel to its own

operation at a time when it is said that there was no air carrier competing in any way with Inter-Island that that was a violation of the antitrust laws of the United States. I am convinced that that is so by the weight of the interpretations put on the act and the motion for summary judgment * * * by the Trans-Pacific Airlines is granted in conformity with this conviction."

Grace has called our attention to the fact that further proceedings in that suit resulted in a revocation of Judge Metzger's order and the entry of a contrary ruling. The government has in effect conceded this.

At the subsequent trial the court (Driver, J.) instructed the jury: "You are instructed that it was not per se in and of itself an unreasonable restraint of trade or commerce for Inter-Island, a surface carrier, to organize and assume control of Hawaiian, an air carrier operating over parallel routes." The jury returned a verdict for Hawaiian and Inter-Island and the court entered judgment dismissing Trans-Pacific's counterclaim.

There is, however, another case in the District of Hawaii in which, the government agrees, the "precise issue" was raised but a contrary conclusion arrived at, i. e., contrary to Judge Metzger's. This is United States v. Inter-Island Steam Nav. Co., D.C.D.Haw.1950, 87 F. Supp. 1010. In that case Judge McLaughlin stated the issue as follows: "Is there a violation of the Sherman Anti-Trust Act in the mere organization and control of a subsidiary air common carrier by a water common carrier for the purpose of having the former transport passengers over routes substantially paralleling the latter's routes and serving areas substantially similar to those served by the latter?" 87 F.Supp. at page 1014.

In coming to a conclusion diametrically opposed to that of Judge Metzger, Judge McLaughlin held: "There is nothing in the statute to prevent a corporation from entering a virgin field, and,

through a subsidiary or otherwise, engaging in a pioneer enterprise. That was precisely what was done in 1929 by Inter-Island in the instant case. The antitrust laws were enacted to promote and not to retard the economic growth of the nation. In a word, the Sherman Act is not an instrument of stagnation. The Supreme Court repeatedly has given a clean bill of health to 'an expansion to meet legitimate business needs'" (at pages 1016–1017).

The government's *per se* argument seeks to succor support from the various Congressional Acts relating to the control of interstate commerce, and more particularly, § 408(b) of the Civil Aeronautics Act, 49 U.S.C.A., § 488(b), and from a number of administrative decisions under those acts.

■ But we are here concerned with the question of Sherman Act *per se* illegality and it seems to us that statutes relating to the jurisdiction of administrative agencies to approve or disapprove, *inter alia*, acquisitions of control by surface carriers of air carriers, *provided* such acquisitions do not restrain competition, are irrelevant. Especially is this so, we feel, where the particular acquisition with which we are concerned was at no time subject to the provisions of those statutes. Railroad Control of Northeast Airlines, Inc., supra; National Air Freight Forwarding Corp. v. C.A.B., supra. We hold, therefore, that it was not, and is not, *per se* violative of the Sherman Act for Grace to acquire and now own 50% of Panagra's stock.

### Grace Line's Competition With Panagra

The government has submitted evidence in support of its charges that there is active passenger competition between Panagra and Grace Line as between the continental United States and the west coast of South America. It also called witnesses and introduced some statistics to prove that at the present time there is an area of competition between them, and ships and airplanes generally with respect to cargo, and that within the

near future this competition will greatly increase.

Speaking broadly, steamship transportation and air transportation are in some measure competitive, though the government frankly admits that services rendered by airplanes and ships are distinct and that each has its own inherent advantages. But that they are competitive in some sense does not resolve the problem. We think everyone will concede that a passenger by sea from New York to any port on the west coast of South America has bought and hopes to enjoy a commodity or service substantially different from an air journey to the same place. In the first place the time element is so vastly different, e. g., from New York to Santiago by air takes today about 12 hours—by steamer 20 to 21 days. Steamer is also more expensive. The Panagra fare from New York to Lima, for example, depending on tourist or first class, ranges from $308.80 to $390.80; by steamer $515 to $1510 in the winter season, and $435 to $1220 in the summer season. Query: Are these interchangeable commodities? Does a substantial portion of the travelling public substitute one for the other with variations of rate and service? Times-Picayune Publishing Co. v. United States, supra; United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. Is the passenger who is willing to spend six weeks on a steamer the same as a person who wants to fly somewhere and back in a hurry? Is the person who desires to transact business in a far away South American city and return a potential steamship passenger to and from the same city?

We are not persuaded that the proof in this case shows that the market is the same. This does not mean that we disagree with the Court of Appeals for the District of Columbia Circuit in Lehman v. Civil Aeronautics Board, 93 U.S.App. D.C. 81, 209 F.2d 289, which rejected the argument advanced by Lehman and Pan American that there was no competition between Pan American and United Fruit Line in the limited area of passenger tourist traffic going to the Caribbean area from the Gulf Ports of the United States. In that case the C. A.B. examiner had found that although the companies did not compete for tourist passenger traffic between all points of the Caribbean, both United Fruit and Pan American would be competing for tourist travel between the United States points and the same vacation travel area. Both the C.A.B. and the Court of Appeals adopted that finding as being logical and reasonable. In the instant case the market was not so narrowly defined nor was there proof of actual competition, aside from bare statistics.

But assuming that the market is the same, let us examine the statistical evidence submitted by the government on the issue of the existence of substantial passenger and cargo traffic competition.

Not only does W. R. Grace and Company, the defendant, own the Grace Line, it has many interests, commercial, banking and manufacturing. The operating revenues of Grace Line for the year 1958 were less than one-fifth of its total sales and operating revenues. The only route of Grace Line that can be said to be in competition with Panagra is its Trade Route 2 between the Atlantic coast of the United States and the west coast of South America. It operates three other routes.

Trade Route 2, called Line A, provides regular liner service between substantially the same areas served by Panagra although it is not co-extensive, each serving areas not covered by the other. Line A accounts for one-fifth of Grace Line's total passenger revenues and for less than one-half of its freight revenues. One of the most important points of difference is that Buenos Aires is a city not served by Grace Line and is the most important city in South America served by Panagra. But we will assume this difference in geography would not be sufficient for a finding that they are not serving identical markets. They cater primarily to two different interests— Panagra sells passenger transportation predominantly whereas Grace Line's

principal service is the carriage of freight. Between the years 1950 and 1958, Panagra carried less than four-tenths of 1% of the tonnage of cargo carried by Grace on its Line A.

Between the years 1950 and 1958 the ratio of passengers carried by Panagra and Grace was about 25 to 1 in favor of Panagra, e. g., in 1958 Panagra carried 128,776 passengers while Grace's Line A carried 4,347. During that same period Panagra's increase of passengers carried was 25% while Grace's volume remained substantially constant.

Even adopting the statistics of the government as showing substantial passenger competition between Grace Line and Panagra, there is no proof nor could we find that the passengers thus carried by ship were potential air passengers or that they were passengers whose needs or desires could only be met by sea transportation.[24] Air transportation is quick, efficient and functional transportation for passengers over long distances. Steamship companies cater to those who have the leisure and inclination for a sea voyage. They are not, under the proof submitted, two forms of transportation "reasonably interchangeable" and do not make up a single market.

We hold, too, that the same reasoning applies with respect to cargo traffic. The airlines cater to traffic that demands high speed transportation of either relatively small lightweight shipments or heavier shipments where the cost of transportation is not a factor or an important factor. Steamships on the other hand meet the need for low cost transportation of all kinds of commodities, particularly those which are heavy or bulky.

It is true that the government has submitted evidence tending to show that the air cargo field, particularly as it relates to heavy cargo, is on the upswing and that possibly in the future it will present an effective reasonably interchangeable service with sea cargo carriage.

We were furnished no statistics of any substantial value to show a relevant market. A few instances were shown where Panagra carried cargo between the same points as Grace Line did. However, there was no evidence of the rates or other factors. The sum total of the evidence shows that as between the two the volume of cargo carried by Panagra as compared to Grace was minuscule. The most the government experts and the witnesses connected with transportation by air who testified on its behalf showed was that indications are that there is developing *some cargo* competition between Grace and Panagra, and between shipping companies and airplane companies, i. e., in some situations it may be competitive. What was clear is that all-cargo air transportation is in an experimental stage and most of the operations are marginal at best.

But the government does not prove violations of the antitrust law by showing that Grace Line competes with Panagra, assuming that it does. It must show that Grace has restrained or monopolized trade or commerce, or attempted to do so. This the government has not done. When Grace entered the virgin field of air transportation in 1929, through Panagra, it was the dominant surface carrier to the west coast of South America. Its entry at that time was not illegal. Through defendants' efforts and with the help of this government Panagra became and remains the dominant air carrier in that area, not through unlawful efforts of Grace or Panagra. If anything has been established it is that Grace has been the only one of Panagra's two partners that has persistently and continuously attempted to improve its service and extend its routes to the United States. Not only has it not prevented the development of Panagra but absent its continuous objections to Pan American's restraints this case would not be here.

24. Cf. Latin American Air Service case, supra at 867.

## 52

### Panagra

The case against Panagra may be divided into three categories, (1) the alleged unlawful acquisition of stock in competing airlines and consequent restraint; (2) by reason of its dominant power in air transportation it allegedly has impeded development of competition between it and Braniff, and engaged in restrictive practices to restrain and impede Braniff from utilizing airports, terminals and other facilities in South America, and (3) price fixing.

Much of the proof in support of these charges relates to matters long since resolved or matters within the special competence of the Civil Aeronautics Board. §§ 408, 411, 412, C.A.A. (49 U.S.C.A. §§ 488, 491, 492).

The acquisitions complained of relate to Panagra's interest in LAB and Faucett, previously discussed. Today Panagra owns 21.5% of LAB stock and about 19% of Faucett. As pointed out above, Panagra acquired its stock interest in LAB at the specific request of this government and in aid of its de-Germanization program in South America in the early years of World War II. We have heretofore held in effect that such acquisitions involved no Sherman Act violations and in the subsequent years its minority interests have not been shown to be of any significance antitrustwise.

As to LAB, Panagra admits that its motives were not completely patriotic and concedes that it hoped there would be some economic benefits earned from its affiliation. After the war when its management contract with LAB expired, its influence and control decreased accordingly. It has only two nominees on a board of directors of six and LAB is in active competition with it on two route sectors in Bolivia.

With regard to Faucett, it and Panagra are in competition on the Lima/Talara sector of Panagra's international route. Panagra received its stock in Faucett when it sold Aerovias Peruanas which had been formed to help Panagra obtain cabotage rights in Peru. All of this has been well known to the C.A.B. Those provisions in its original agreement with Faucett that might be considered to be in violation of the antitrust laws were removed after the C.A.B. disapproved of the agreement in 1949. The amended agreement, which includes a provision for the Panagra stock interest and its two of the nine directors, was specifically approved by the C.A.B. in 1950.

Also with respect to Faucett, it was the government's claim that Panagra, relying on its agreement with Faucett, prevented that carrier from entering into an interline agreement with Braniff. We are not persuaded. The most that the proof showed was that when Braniff attempted to make such an agreement with Faucett, Faucett refused. No evidence was offered to show that the refusal was at the direction or with the approval of Panagra. On the contrary, it was shown that Panagra was never consulted by Faucett on that question at all.

The government did prove, and proved conclusively, that in the late 1940's Panagra carried on a bitter and consuming price war with PIA, an alleged Peruvian air carrier. After unsuccessfully opposing PIA's certification as a foreign flag carrier it soon found that PIA was making serious inroads on Panagra's traffic by accepting payment for tickets to the United States in local Peruvian currency.

Panagra took up the challenge and it, too, accepted local currency. It lost money, but so did PIA. As Panagra so well states, "fare cutting is a chronic disease in the air carrier industry, and it is a very serious disease; PIA died of it." It expired in 1949.

The government also proved, without alleging so in its complaint, that prior to 1951 Panagra and Pan American participated in many price fixing arrangements. Exactly what the terms of these arrangements were is not shown but, reading between the lines, we are convinced that it was a common practice.

However, in 1946, International Air Transport Association (IATA), formed for the purpose of setting rates for all its members in international air transportation, was approved by the C.A.B. and became effective as to United States-South America carriers in 1951. Panagra is a member—so is Pan American. The rates agreed upon at IATA conferences are approved by the C.A.B. pursuant to § 412 of the C.A.A. (49 U.S.C.A. § 492) and such agreements, pursuant to § 414 of the C.A.A. (49 U.S.C.A. § 494), are thus clothed with antitrust immunity. No proof was offered by the government relating to any such agreements after 1951, except that it did show that prior to conferences Pan American and Panagra would discuss prices and rates in violation of the rules of IATA. But since Pan American is Panagra's agent for such purposes with C.A.B. approval how else could it act?

The remaining charges relate to Panagra's opposition to Braniff and its stubborn resistance to lending a helping hand to a new competitor, Braniff; also to the petty and amusing instances of retaliation and business skullduggery. The government evidence seems to picture Braniff, an experienced carrier, as an innocent tyro in the air transportation business, being buffeted and barked at by Panagra. The government showed that even though Panagra was helpful and courteous to Braniff in its initial survey flights after it was certificated, it became pigheaded and uncharitable when it insisted upon being paid for the use of its facilities and supplies and services. We get the impression that Braniff wanted everything for nothing, including routes not certificated. The action of Panagra in trying to keep some of Braniff's employees out of the Rotarians and warning their employees not to fraternize with Braniff's employees, and bribing a South American petty official to turn over manifests in order to learn what passengers Braniff was carrying, are all colorful incidents but hardly add up to antitrust violations.

Not much more need be said other than to add that despite all of Panagra's restraints and restrictive practices against Braniff, Braniff continues to get its fair share of the South American traffic. Although Panagra has been in the market for 30 years and Braniff a little over 10 years it does more than half as much business as Panagra.

In short, all of the charges against Panagra relate to matters in the distant past or are minor incidents in a highly competitive field. They are matters of doubtful antitrust significance and without present day consequences.

Instead of showing any Sherman Act restraints or monopolization by Panagra the proof convinces us that the competition is real and active and expensive to the American taxpayer and as the foreign competition increases it will become more expensive.

Defense of Laches

Finally, Grace and Pan American have interposed the affirmative defense of laches. In view of our disposition of the case against Grace we need only discuss this defense as it applies to Pan American, and as to it, the defense is untenable.

In the course of our opinion it was made to appear, we believe, that governmental efforts to alleviate the adverse effects of Pan American's restraints upon Panagra began as early as 1941 and continued thereafter even subsequent to the institution of this suit. Any delay in bringing this action was due to concerted efforts designed to work out a compromise and to thereby avoid suit if possible in the interests of all concerned including Pan American. It can hardly be said to be inexcusable delay and certainly no prejudice to it has been shown by Pan American as a result thereof.

Decree

In accordance with all of the foregoing, it is hereby ordered and decreed that the complaint, insofar as it relates to W. R. Grace and Company and

Pan American-Grace Airways, Inc., be and is dismissed; and that the government is entitled to a decree in its favor as against Pan American World Airways, Inc. In order to fashion such final decree it is ordered that Pan American show cause on the 24th day of March, 1961, why such decree should not contain a provision directing it to divest itself of its stock in Panagra.

This opinion is filed in lieu of findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.